IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: CYCLOBENZAPRINE HYDROCHLORIDE EXTENDED-RELEASE CAPSULE PATENT LITIGATION ) ) ) ) ) ) | Civ. No. 09-MD-2118-SLR |

**MEMORANDUM ORDER**

At Wilmington this 20th day of May, 2011, having considered plaintiffs' motion for a temporary restraining order to enjoin defendants Mylan Pharmaceuticals, Inc. and Mylan Inc.'s (collectively, "defendants") from manufacturing, using, offering to sell, or selling generic extended release cyclobenzaprine products;

IT IS ORDERED that said motion (D.I. 256) is granted, as follows:

1. **Background.** Plaintiffs Eurand, Inc. and Anesta AG (collectively, "plaintiffs") brought suit against defendants for infringement of U.S. Patent Nos. 7,387,793 ("the '793 patent") and 7,544,372 ("the '372 patent") pursuant to 35 U.S.C. § 271(e)(2)(A) arising from defendants' filing of an Abbreviated New Drug Application[1] with the Food and Drug Administration. (D.I. 234 at 3-4) From September 29 to October 7, 2010, a bench trial was held on plaintiffs' claims that defendants infringe the patents-in-suit, and defendants' defenses and counterclaims that the patents-in-suit are invalid and/or unenforceable due to obviousness, indefiniteness, failure to specify the best mode, and/or inequitable conduct. On May 12, 2011, the court issued its opinion, finding that defendants' generic extended release cyclobenzaprine products infringed the patents-

---

[1] Mylan's ANDA application number is 90-738.

in-suit, and that the patents-in-suit were obvious under 15 U.S.C. § 103. (D.I. 254)

2. **Legal standard.** A temporary restraining order, like a preliminary injunction, is an extraordinary remedy. In order to prevail on their motion, plaintiffs must demonstrate: (1) a likelihood of success on the merits; (2) they will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief. *Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir. 2004). The elements also apply to temporary restraining orders. *See NutriSweet Co. v. Vit-Mar Enterprises., Inc.*, 112 F.3d 689, 693 (3d Cir. 1997) ("*NutraSweet I*") (a temporary restraining order continued beyond the time permissible under Rule 65 must be treated as a preliminary injunction, and must conform to the standards applicable to preliminary injunctions). "[F]ailure to establish any element in [plaintiffs'] favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mar Enterprises., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) ("*Nutra Sweet II*").

3. **Discussion.** Plaintiffs filed their motion for a temporary restraining order on May 15, 2011, arguing that the court made five substantial errors of fact or law that will lead to the court's opinion being reversed on appeal. (D.I. 257 at 5-11) Plaintiffs argue that if the court does not grant a temporary restraining order, they will suffer irreparable injury in the form of market erosion, price erosion, reduction of workforce, reduction of research funding, and loss of consumer goodwill from the defendants entering the market with a generic version of extended release cyclobenzaprine on May 13, 2011. (*Id.* at 12-15)

2

4. **Likelihood of success on appeal.** Plaintiffs argue that the court's opinion suffers from five substantial errors: (1) the court erroneously found that plaintiffs' expert, Dr. Daniel Weiner ("Weiner"), admitted that $T_{max}$ can be calculated by a computer program when it was actually defendants' expert Dr. Courtney Fletcher ("Fletcher") who made the cited statement; (2) the court was wrong to rely on Fletcher to "fill in the gaps" in the disclosure of the prior art because he was admittedly not one of ordinary skill in the art and his testimony on pharmacokentic ("PK") modeling was outside the scope of his expert report; (3) the court's finding that the claimed PK profile was disclosed in the Winchell reference was erroneous because the values disclosed were steady state instead of single dose, and one of the disclosed values did not fall within the claimed ranges; (4) the court's finding that inventor James Clevenger's ("Clevenger") testimony contradicted plaintiffs' position that the lack of known pharmacokenetic/pharmacodynamic correlation precluded a finding of obviousness because of the next statement after the court's citation contradicted the court's finding; and (5) the court's conclusion that "optimization" of an immediate release PK profile into an extended release PK profile was incorrect because it was based on testimony related to claimed dissolution profiles and testimony about how the inventors came up with the claimed invention.

5. The court acknowledges that it erred when it stated that Weiner made the admission that $T_{max}$ was calculable, when in fact the statement was made by Fletcher. (D.I. 223 at 981:21-982:2; 991:18-992:7) That said, Weiner did admit that his program, WinNolin, has the capability of computing the $T_{max}$ in some models when other parameters of the model are known. (D.I. 224 at 1293:3-1294:1) This testimony,

3

combined with that of Fletcher, supports the court's finding that $T_{max}$ is a calculable value.

      6. Assuming, arguendo, that it was improper for the court to rely on Fletcher's testimony to fill in the gaps in the disclosures of the prior art, the error is harmless as much of his testimony was corroborated by defendants' other expert, Dr. Gordon Amidon ("Amidon"), and/or Weiner himself. For example, Weiner agreed that the claimed $C_{max}$ and $AUC_{0-168}$ of the patents in suit are inherent to FLEXERIL®, plaintiffs' immediate release product.[2] The court cannot say for certain that the scope of Fletcher's testimony was outside the scope of his report as it cannot locate a copy of his report in any of the exhibits cited by parties. Regardless, the portion of Fletcher's testimony that was objected to was largely corroborated by Clevenger, who testified that he took blood levels from a printed publication and put it into a computer program in order to calculate various parameters of FLEXERIL® that he later used to target with his extended release formulation. (D.I. 222 at 941:1-946:11) While the court cannot exclusively rely on inventor testimony to show obviousness, "inventors' testimony [is] relevant to whether the invention[] would have been obvious to a person of ordinary skill in the art." *Neupak, Inc. v. Ideal Mfg. and Sales Corp.*, 41 Fed. Appx. 435, 440 (Fed. Cir. 2002)

      7. The court clarifies further its statement that the PK constants were disclosed by the Winchell reference as follows. The claimed $C_{max}$ is undisputably disclosed, and

---

[2] Weiner agreed that the PK numbers ($C_{max}$ AUC) were the same but not the drug formulations because one was immediate release and one was extended release. (D.I. 224 at 1263:7-1264:15)

4

the other values can be obtained via routine experimentation from the Winchell and Hucker references as well as plaintiffs' FLEXERIL® product. An example of this experimentation can be found in the very way plaintiffs created their own extended release cyclobenzaprine product: by using commercial software combined with written references to create a profile that is then targeted by an extended release product. (D.I. 222 at 941:1-946:11) The steady state/single dosage distinction is really a distinction without a difference, as the extended release products targeted the steady state PK profile to achieve effectiveness.

8. Clevenger's testimony contradicted plaintiffs' position on the necessity of an established pharmacokenetic/pharmacodynamic relationship. Plaintiffs argue that Clevenger's testimony that he went "to the clinic" because success "depend[ed] on the relationship between the blood levels and the therapeutic effect" shows that such a relationship must be known. (D.I. 257 at 9) The court disagrees. This testimony simply shows that the inventor needed to verify his results in the lab. Obviousness calls for an expectation of success, not a guarantee. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). Some routine experimentation does not render an otherwise obvious claim valid. *See Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1349 n.2 (Fed. Cir. 2009).

9. Contrary to plaintiffs' assertion, the court did not only rely on testimony related to the claimed dissolution profile in finding that optimization of an immediate release pharmacokentic profile was routine for one of ordinary skill in the art. (D.I. 257 at 9) The court cited *Purdue Pharma Products. v. Phar Pharmaceutical, Inc.*, 642 F. Supp. 2d 329, 373 (D. Del. 2009), and Clevenger's testimony in support of its finding.

Clevenger's testimony itself was "relevant to whether the invention[] would have been obvious to a person of ordinary skill in the art." *Neupak, Inc.,* 41 Fed. Appx. at 440.

10. Having addressed the asserted errors, nevertheless, the court recognizes that its primary responsibility is to create a record for appeal. As plaintiffs' success on appeal is just as likely as not, this factor marginally supports a temporary restraining order.

11. **Irreparable harm.** More assured is the fact that plaintiffs will suffer irreparable harm if a restraining order is not granted. Defendants admit that plaintiffs will suffer irreparable harm, although they argue that the harm has already occurred and cannot be cured by a restraining order. (D.I. 260 at 13) The court disagrees. In every ANDA case there is a likelihood of irreparable harm for the name brand manufacturer as the generics have a ready-made market to flood as soon as they receive approval to release their products. Here, plaintiffs could recover some of their monopoly pricing if the court were to order a restraining order and plaintiffs took their authorized generic off of the market. Therefore, this factor favors plaintiffs.

12. **Harm to defendants.** The harm to the defendants from a temporary restraining order is minimal. Defendants claim that they have already launched their products, thus triggering their 180-day exclusivity period that they cannot get back if the court were to issue an injunction. While this is a legitimate concern, it does not strike the court as being more persuasive than the possibility of irreparable harm to plaintiffs. Defendants knew that this was an "at risk launch" and chose to do so anyway, despite the fact that the court found that defendants infringed the patents-in-suit, and plaintiffs

had not exhausted their appeals. Defendants bore the risk of a restraining order both from this court and the Federal Circuit. Furthermore, defendants' market will not collapse as there will always be a public that is willing to purchase a generic version of a branded drug. This factor favors plaintiffs.

13. **Public interest.** The public interest factor is neutral. The public has both an interest in strong patent protection that encourages innovation as well as the ability to purchase inexpensive drugs. *Biotechnology Industry Org. v. District of Columbia*, 505 F.3d 1343, 1347 (Fed. Cir. 2007); *Capo, Inc. v. Dioptics Medical Prods., Inc.* 387 F.3d 1352, 1358 (Fed. Cir. 2004).

14. **Conclusion.** The majority of factors favors the issuance of a temporary restraining order enjoining defendants from manufacturing, using, offering to sell, or selling generic extended release cyclobenzaprine products pending appeal. The court will issue such an order if plaintiffs agree to seek an expedited appeal and remove their generic product from the market. The parties shall submit to the court a proposed form of order on **Monday, May 23, 2011.**

_____
United States District Judge