1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                  - - -

4
       IN RE:  CYCLOBENZAPRINE        :    CIVIL ACTION
5      HYDROCHLORIDE                   :
       EXTENDED-RELEASE CAPSULE        :
6      PATENT LITIGATION,              :
                                       :    NO. 09-MD-2118-SLR
7      ---------------------------     :
       EURAND, INC., CEPHALON,         :    CIVIL ACTION
8      INC. and ANESTA AG,             :
                                       :
9               Plaintiffs            :
                                       :
10          v.                         :
                                       :
11     MYLAN PHARMACEUTICALS INC.,     :
       MYLAN INC., and BARR            :
12     LABORATORIES, INC.,             :
                                       :
13              Defendants            :    NO. 08-889-SLR

14

15                                 - - -

16                           Wilmington, Delaware
                             Monday, May 23, 2010
17                           8:57 o'clock, a.m.

18                                 - - -

19     BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

20                                 - - -

21

22

23

24                                Valerie J. Gunning
                                  Official Court Reporter
25

1    APPEARANCES:

2

                 FISH & RICHARDSON P.C.
3                BY:  WILLIAM J. MARSDEN, JR., ESQ. and
                      DOUGLAS E. McCANN, ESQ.
4

5                        -and-

6

                 FISH & RICHARDSON P.C.
7                BY:  JONATHAN E. SINGER, ESQ.
                      (Minneapolis, Minnesota)
8

9                     Counsel for Plaintiffs
                      Eurand, Inc., Cephalon, Inc., and
10                    Anesta AG

11

12

13               COOLEY GODWARD KRONISH LLP
                 BY:  TRYN T. STIMART, ESQ.
14                    (Washington, D.C.)

15

                      Counsel for Plaintiff
16                    Eurand, Inc.

17

18

                 PHILLIPS, GOLDMAN & SPENCE, P.A.
19               BY:  MEGAN C. HANEY, ESQ.

20

21                    Counsel for Defendant
                      Barr Laboratories Inc.
22

23

24

25

```
1    APPEARANCES (Continued):

2

3                RICHARDS, LAYTON & FINGER
                 BY:  LAURA HATCHER, ESQ.
4

5
                            -and-
6

7                HUSCH BLACKWELL SANDERS WELSH & KATZ
                 BY:  DON J. MIZERK, ESQ.
8                     (Chicago, Illinois)

9
                 Counsel for Defendant
10               Anchen Inc.

11

12

13               WILEY REIN LLP
                 BY:  JAMES H. WALLACE, JR., ESQ. and
14                    MARK A. PACELLA, ESQ.

15
                            -and-
16

17               MYLAN INC.
                 BY:  JOSEPH DIVINAGRACIA, ESQ.
18

19               Counsel for Defendant
                 Mylan Inc.
20

21

22               MORRIS JAMES LLP
                 BY:  MARY B. MATTERER, ESQ.
23

24
                 Counsel for Defendant
25               Impax Laboratories, Inc.
```

```
 1                      P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4      beginning at 8:57 a.m.)

 5

 6              THE COURT:  Good morning, counsel.  Thank you

 7      for making yourselves available.

 8              What I plan to do is start off with some

 9      questions for each party because, quite frankly, I don't

10      really know how this process works from a practical

11      standpoint because generally we don't get involved in this

12      aspect of it.

13              So let me start off by saying that the scenario

14      from which I have been operating is as follows.  That if

15      plaintiffs should prevail on appeal and Mylan has been

16      allowed to continue its launch, the branded market cannot

17      ever truly recover.

18              On the opposite side, if defendants prevail on

19      appeal and Mylan has not been allowed to continue its

20      launch, there is a market for it to enter, but it will have

21      certainly lost money, and if other generics are allowed to

22      enter the market when it has not, it has potentially lost

23      market share and customers.

24              So certainly there are risks for both, and so I

25      need to get some fundamental information since my job is to
```

1    balance those risks.

2                    So, Mr. Marsden, are you speaking for --

3                    MR. MARSDEN:  I will be speaking to certain

4    issues, but I think the first questions, Mr. Singer will

5    speak to.

6                    THE COURT:  All right.  You're going to throw

7    him into the fire.

8                    MR. MARSDEN:  Yes.  Throw him under the bus.

9    Yes.

10                   THE COURT:  Okay.

11                   MR. SINGER:  I think that's fair enough.  Good

12   morning, your Honor.  How are you?  Nice to see you again.

13                   THE COURT:  Nice to see you.

14                   MR. SINGER:  I think you fairly stated what will

15   happen to the branded market.

16                   THE COURT:  Well, no, you are not saying

17   anything.  I have questions.

18                   MR. SINGER:  Oh.

19                   THE COURT:  Yes.  We're not arguing yet.  I have

20   questions.

21                   MR. SINGER:  Okay.

22                   THE COURT:  Then you can argue.

23                   So my first question is, tell me what an

24   authorized generic is as opposed to a generic who has had to

25   go through the ANDA process.

1          MR. SINGER:  Okay.  So an authorized generic as

2     opposed to Mylan and the defendants here is simply a measure

3     that a company like Cephalon can take to sort of mitigate

4     harm and capture as it were some of the generic sales.

5     That's really all it is.  So when the market goes generic,

6     Cephalon can contract with another company, or itself,

7     depending on how things work, and put out a generic version

8     of the drug to capture essentially some of the sales.  So

9     what it is is a mechanism to mitigate damages as opposed to

10    sort of change the dynamics of the market back to where it

11    was when Cephalon was in a position of having a branded

12    product.

13          So hopefully that answers your question.

14          THE COURT:  That answers the first question.

15          MR. SINGER:  Okay.

16          THE COURT:  So plaintiffs benefit from the

17    authorized generic either by actually producing its own and

18    directly making the profits from that, or by authorizing a

19    third party and generating profits like that.  All right.  I

20    understand that.

21          So in this case, I don't really understand the

22    timing of what happened because it's my understanding that

23    plaintiffs in this case did launch its authorized generic to

24    counter -- well, that's what I want to know, that plaintiffs

25    did launch its authorized generic, and I don't know how that

1     timing coincided with its filing of a TRO.

2              MR. SINGER:  And I will ask Mr. Marsden if he

3     has the facts if I get this right because this is the part

4     where we sort of split this up.

5              The timing of this was that plaintiffs learned

6     of -- plaintiffs got the Court's opinion at whatever,

7     4:00 o'clock on Thursday, read it, saw the Court's order,

8     analyzed it from our perspective, and began to discuss the

9     possibility of moving for temporary relief and contacting

10    Mylan.  At the same time, the business side of the company

11    learned of Mylan's essential launch of the product and the

12    response of the authorized -- authorized generic.

13             Response was then launched in response to that

14    while at the same time the parties are in discussion or

15    attempting to discuss the aspect of moving for a temporary

16    restraining order.

17             I believe the timing is that plaintiffs

18    contacted Mylan to inform Mylan that plaintiffs were

19    intending to move for relief from the Court's order.  Those

20    contacts were not returned.  And then the parties both then

21    after that actually physically launched the product.  It's

22    sort of at some level, they kind of merged, your Honor.  I

23    mean, I don't know if anyone can show one way or the other

24    whether at 11:00 a.m. someone did this, and at 12:00 p.m.

25    someone did that.

1          THE COURT:  But, to some extent, the business

2     branch was making decisions and other -- I mean, well, it

3     could be that there were more than one decision-maker and

4     they had different interests in this litigation.

5          MR. SINGER:  I think it's very fluid is what --

6     it was happening very quickly in response to an order, you

7     know, received in the afternoon.  And I have laid out of my

8     understanding of sort of the chronology of this, but it was

9     certainly always plaintiffs' intent right away from the

10    moment they got the order and analyzed it, if there was a

11    basis for relief, plaintiffs moved very promptly.

12          I mean, this wasn't something where plaintiffs,

13    you know, waited a couple days.  You know, we contacted

14    defendants less than 24 hours later on an order received at

15    4:00 o'clock on Thursday.  And, again, I don't know that

16    anybody is going to be able to demonstrate something

17    happened at 10:00 and then something happened at 11:00.  We

18    just don't have that record in front of us today.  But that

19    is my understanding of the chronology.

20          And, Mr. Marsden, did I get that right?

21          MR. MARSDEN:  I think you did, and I will just

22    add that the authorized generic was a reaction to our

23    understanding that Mylan had launched.  And the way it works

24    in the marketplace, your Honor, is that the generics

25    generally will flood the market with their product, and if

1   you don't immediately respond with the authorized generic,

2   your opportunity to capture some of that market is lost.

3   Hence, the need to act essentially on a hair trigger with

4   respect to that.

5          THE COURT:  Okay.  Now, my last question, and

6   then I have a series of questions for the defendants, and

7   then I will let you argue.

8          MR. SINGER:  Okay.

9          THE COURT:  Although I stated in my decision

10  what I thought might happen to the branded market, in other

11  words, that it really can never be recaptured if the

12  generics flood the market while we're waiting for the

13  Federal Circuit to review my decision, do you have facts,

14  figures?

15         If you can, for purposes of this record, just,

16  because I'm going to ask the defendant for the same kind of

17  information, can you tell me exactly what has happened in

18  the past and what a branded companies like plaintiffs can

19  expect to happen if I don't impose an injunction?

20         MR. SINGER:  Well, what typically happens, and

21  there are studies to show this, and we can certainly provide

22  those to the Court, that in the scenario we have here of

23  sort of an oral medication in the general physician market

24  is that within -- depending on whose study you look at,

25  within three weeks to three months, the market will be

1    90-percent generic.  So we could be back here in a month and

2    the market will be 90-percent generic and it will take some

3    other time frame to do that.  And when I say 90-percent

4    generic, that's what I mean, that the prescriptions will be

5    filled with 90-percent generic product, whether it be from

6    Mylan and its position, or the authorized generic that's on

7    the market as well.

8              And in terms of recapturing the market, which I

9    think was sort of your --

10             THE COURT:  Yes.  What happens if I allowed

11   this, if I decided defendants had the better position after

12   all and I didn't enjoin their launch and then the Federal

13   Circuit said, once again, you got it wrong, Judge.

14             MR. SINGER:  The Federal Circuit being what it

15   is.

16             So what happens is the market stays generic

17   right through the Federal Circuit decision.  If the Federal

18   Circuit then says, no, that was incorrect, it should have

19   been -- it should have stayed branded all along, the market

20   has to be rebuilt from -- essentially from scratch, because

21   the infrastructure that was in place to sell a product such

22   as -- and it's a substantial infrastructure, is gone.

23             I mean, we put in our papers, your Honor,

24   already, Cephalon has had to give notice to layoff

25   individuals.  That's the way it works.  And so what happens

1    is if the Federal Circuit reverses, yes, the Mylan product

2    is no longer on the market and the market for a branded

3    cyclobenzaprine product has to be rebuilt from, I won't say

4    ground zero, because there's some good will remaining in the

5    market, but has to be rebuilt almost from scratch -- new,

6    new promotional, new salespeople, all that stuff that has

7    taken several years to be built in the first instance needs

8    to be rebuilt from scratch, and whether it can be built to

9    the same place is very unlikely.

10           THE COURT:  And generally, has the Federal

11   Circuit granted motions to expedite?  Does it have some

12   feeling for the exigencies of this particular kind of case?

13   And I don't even know what an expedited appeal means in the

14   Federal Circuit.

15           MR. SINGER:  It's actually in the parties'

16   hands.  That's the beauty of this.  The Federal Circuit

17   certainly has a feeling for what's going on.

18           We cited, I hope it was in our papers earlier,

19   but certainly in our papers last night, the Eli Lily case

20   about Actavis, where the Federal Circuit essentially put in

21   the same relief that your Honor did under 62(c), entering a

22   stay pending appeal where the patent was found invalid for

23   Eli Lily's Actavis product pending appeal to prevent the

24   generic launch just so the Federal Circuit can essentially

25   make sure, which is what we think the statute really

1    provides for.

2             But it's in the parties' hands, your Honor,

3    because the way the Federal Circuit works is they will grant

4    the motion for expediting.  If both parties are in favor of

5    it, there's no harm on them.  They don't have, fairly

6    speaking, the docket you have, your Honor.  It's a very

7    different docket.  But the parties then control the speed of

8    the appeal by how fast they file their briefs.

9             And so if Cephalon files its brief within

10   30 days and Mylan responds within 30 days and the reply

11   brief is in 15, even some shorter period, where Cephalon

12   files its brief within two weeks and they respond within two

13   weeks, et cetera, the appeal is ready for argument as soon

14   as that last brief goes in.

15            And with a joint motion to expedite the

16   appeal, the argument will be heard on, if it's granted --

17   I can't make promises -- but will be heard very quickly

18   thereafter.

19            So that's did nice part about an expedited

20   appeal, is it's in the -- the people in this room, it's in

21   our hands to file as quickly as your Honor orders us to

22   file, and we will so do.

23            THE COURT:  All right.  Those are my preliminary

24   questions.

25            MR. SINGER:  Okay.  Very well.

```
 1                    THE COURT:  I will hear from you momentarily.

 2                    And let's get someone up on the hot seat for

 3      defendants.

 4                    Mr. Wallace?

 5                    MR. WALLACE:  Good morning, your Honor.

 6      Mr. Horwitz sends his apologies.  He's with his 95-year-old

 7      mother at the hospital.

 8                    THE COURT:  Oh, all right.  Well, I have been

 9      there, done that, and I certainly accept those apologies and

10      wish him well.

11                    I was amazed when I read the cases that you

12      provided to me on Friday that, according to some of the

13      language, the FDA considers the 180-day exclusivity period

14      to start ticking even after the grant of a partial summary

15      judgment, which, in my world, judgment hasn't even actually

16      been entered yet.

17                    How does this -- I mean, I understand there are

18      two ways that the clock starts ticking, either by a

19      commercial launch or court decision, but in a case like

20      this, does the FDA blindly start the clock?  How does it

21      start ticking, and are there any appeal processes and any

22      way to go to the FDA and say, listen, the judge did this, we

23      don't agree with it, but don't penalize us for the judge's

24      decision.

25                    MR. WALLACE:  You put your finger on a very
```

1    complicated question of law.  The 180 days is clearly

2    triggered to start upon the marketing by the first to file.

3    There are other things that can trigger it, and as you

4    recall, there was some movement afoot several months ago by

5    our co-defendants to trigger -- there are certain defaults

6    that can occur.

7             And as you may recall, early on, way before

8    trial, Mylan was having some regulatory issues regarding its

9    ANDA, and there was a delay while additional testing

10   materials were submitted to the FDA.

11            Anchen and Barr, as your Honor may recall, were

12   urging your Honor, after there was a failure of evidence of

13   infringement by Anchen, to enter a final judgment in

14   Anchen's favor prior to your Honor's decision and judgment

15   against Mylan.  And I don't purport to be able to stand up

16   here and lecture on all nuances of the triggers, but there

17   is one trigger that floats around, that if the first to

18   file cannot get approval and judicial clearance while

19   another ANDA filer is clear to market for 75 days, then

20   the first to file can, under those circumstances, lose its

21   exclusivity.

22            And that, in fact, is one of the reasons Mylan

23   wanted to start marketing, is because there is this threat,

24   and it's a very complicated question of law.

25            THE COURT:  I understood that -- I was surprised

1    to see all the jockeying that goes on among the generics

2    with the FDA by those cases that you -- there are other

3    worlds out there that we're not always aware of.

4              MR. WALLACE:  Yes, we're not always on the

5    same wavelength.  I think your Honor correctly perceives

6    that.  We're friendly competitors and aggressive

7    competitors.

8              So your Honor is quite right.  What can trigger,

9    we could go on for hours talking about it, and people who

10   really understand it could go on for hours.  But it's a very

11   complicated issue, and from Mylan's standpoint, we've been

12   litigating for several years.  We tried the case.  We got

13   the opinion of invalidity.  We won it fair and square, and

14   that's why Mylan decided that in light of all those

15   circumstances, including the potential for forfeiture of the

16   exclusivity, launched its product.

17             THE COURT:  Now, at this point, are all the

18   generics, with the exception of the authorized generic, are

19   all the generics in line involved in this litigation or are

20   there others out there in line over which I have not had

21   jurisdiction?

22             MR. WALLACE:  The only generics I'm aware of

23   that are floating around here who have challenged the

24   patents are Mylan, Barr, Anchen and Impax.

25             As your Honor recalled, Impax settled after the

1    trial.  Anchen has a judgment of noninfringement and

2    invalidity.  And Barr, of course, has a judgment of

3    invalidity.

4              So as far as I know, that's the generic picture.

5    Barr, Anchen and Impax, of course, are barred pending the

6    180-day exclusivity, and I cannot speak to their regulatory

7    status.  The last time I checked, they did not yet have

8    tentative approval from the FDA.

9              THE COURT:  All right.  Now, clearly, Mylan has

10   a lot to lose if I impose an injunction and Mylan's 180-day

11   exclusivity period is still ticking and they are sitting

12   there with their hands tied.

13             So my question to you is -- well, a couple of

14   questions in that regard.

15             It strikes me that there is certainly a loss of

16   money and potentially a loss of market share and customers.

17   Are there ways for me to protect Mylan, but yet protect the

18   integrity of the market and the process pending Federal

19   Circuit appeal in terms of, do I have the authority to

20   enjoin the other generics to at least you might lose your

21   180-day exclusivity, but at least you wouldn't be last on

22   the market.

23             Is there a bond that should be posted, and is

24   that permissible by plaintiffs, if defendants ultimately

25   prevail on appeal, that would at least give Mylan some

1    reimbursement for the loss of money?  Are there ways,

2    practically speaking, to, again, preserve the integrity of

3    the market pending Federal Circuit appeal, but also protect

4    Mylan, because I do understand that Mylan has a position

5    that should be protected.

6              MR. WALLACE:  I appreciate that question.  And

7    just to break it up into bite-sized portions, as far as

8    enjoining the -- well, I would suggest that Barr, vis-a-vis

9    your Honor's litigation, is pretty much in the same

10   situation.  They got a decision of invalidity.

11             My friend, Don Mizerk, representing Anchen, is

12   in a different position from Barr and Mylan in that there

13   was no evidence of infringement presented against his

14   client, so I've heard no suggestion from the plaintiffs that

15   they're somehow going to take an appeal from that judgment

16   of noninfringement when they had no evidence of

17   infringement.

18             So I'm aware of no precedence, and my guess is

19   my friend, Mr. Mizerk, is not going to volunteer any that

20   would permit your Honor to enjoin Anchen.

21             I appreciate your Honor's creative thinking to

22   figure out is there a way to somehow, in effect, recapture

23   or toll the 180 days, and we've scratched our head over the

24   very same thing and have not really come up with anything on

25   that.

1          The question of bond, and I have an agreement --

2     I don't know whether your Honor has gotten a copy of our

3     unredacted paper we filed last night.

4          THE COURT:  I got it this morning as I was kind

5     of walking in.

6          MR. WALLACE:  All right.  Mr. Marsden and I have

7     agreed, with your Honor's permission, that we're not going

8     to mention numbers in open court.

9          THE COURT:  All right.

10          MR. WALLACE:  Because I don't want to have to

11     impose on your Honor or our colleagues to exit the place.

12          THE COURT:  All right.

13          MR. WALLACE:  But there is a number in our

14     affidavit attached to that paper, which is many times

15     more than the million dollar bond that has been suggested by

16     the plaintiffs.

17          If I could comment about this market

18     disruption --

19          THE COURT:  Yes.

20          MR. WALLACE:  -- that you and counsel for

21     Cephalon discussed, to be sure, with the launch of a generic

22     product, the brand product will lose market share, and there

23     have been lots of studies on this.  And it depends on the

24     product.  It depends on how many generics.  But it will

25     clearly lose some market share.  Whether it's 90 percent,

1    that might be a little too gloomy for them.  Generally, they

2    don't lose much in terms of price because there will be

3    certain customers who are going to insist on the branding

4    product come hell or high water.  There will be other

5    customers, mainly insurance providers, who will insist on

6    the generic if you want reimbursement.

7             So the branded product will be there.  Since

8    they have an authorized generic, it's their factory making

9    those capsules, so the production will still be there.  And

10   if, for some reason, your Honor is ultimately reversed, the

11   brand name is out there, the product is out there, the

12   factory is out there.  The branding price has not eroded

13   that much, and obviously, if there were no generic

14   competition, they could recapture the market share and

15   increase the price.

16            So that's a little nuance on what has happened,

17   will happen, or might happen in the market, depending on

18   what goes on.

19            THE COURT:  All right.  So basically I think

20   what you might be saying is as follows.  Judge, go ahead and

21   insist on expedited appeal regardless.  You might not be

22   saying that, but I would be saying that.  And because the

23   plaintiff probably -- the plaintiffs probably would not

24   agree to the kind of number that you have mentioned in your

25   papers, and because the branded product isn't going to go

1    away altogether, and your 180-day exclusivity is,

2    undoubtedly, going to go away, that it makes more sense

3    to allow Mylan to go forward, expedited appeal, and the

4    harms -- the irreparable injury weighs in favor of

5    defendants more so than plaintiffs.

6              MR. WALLACE:  Well, certainly, we have no

7    objection to an expedited appeal, but I do want to address

8    one thing, and that is the four factor test.  And they're

9    interesting questions about do we follow the Third Circuit

10   four factor test or do we look at the Federal Circuit.

11             THE COURT:  And I actually thought the D.C.

12   Circuit, or the District of Columbia, the cases that you

13   gave me, was an interesting take.  That you look at them

14   all, and it really does come down to irreparable harm, which

15   in many instances I've decided for me to predict the

16   likelihood of success at the beginning of a case, or

17   certainly what the Federal Circuit will do on appeal is just

18   a guessing game on my part.

19             But I understand that the Third Circuit standard

20   is different than what I was reading.

21             MR. WALLACE:  Yes.  Well, the interesting thing,

22   your Honor, of course, here, we're talking about likelihood

23   of success after two years of litigation, a seven-day trial,

24   and a decision of invalidity.

25             THE COURT:  All right.  Before you go any

1   further, Mr. Wallace, I think I'm done with my questions.  I

2   have one more question, which I think you might have already

3   answered, but before we get into real argument, I think I

4   will need to go back to plaintiffs and have them argue and

5   then have you argue in response.

6               MR. WALLACE:  Certainly.

7               THE COURT:  So that I'm fair with my process.

8               And I guess in terms of -- I think you've

9   probably already answered that.  In terms of facts and

10  figures associated with the consequences of an injunction

11  from Mylan, can you just tell me what you would foresee the

12  consequences of an injunction would be for Mylan for

13  purposes of the record.

14              MR. WALLACE:  Absolutely.  And I will be very

15  brief.

16              THE COURT:  All right.

17              MR. WALLACE:  In terms of lost future profit,

18  there is a number in the papers --

19              THE COURT:  All right.

20              MR. WALLACE:  -- we gave you.  But it gets

21  bigger, your Honor, because we found out the affidavit or

22  declaration that I have attached to last night's paper was

23  done Friday morning, I think it was.

24              Since then, we have received from plaintiffs a

25  form of injunction.  With that reversion, we've gotten at

1    least three or four versions of their proposed injunction.

2    With every version, it gets more onerous.

3            The provision that really creates havoc in terms

4    of customer relations and out-of-pocket cost, they are

5    asking your Honor to not only make Mylan stop distributing

6    product to the drugstores, but they are asking your Honor to

7    make Mylan recall the product that is out there, not just

8    until the drugstores stop selling, but to actually bring the

9    product back.  That has three serious consequences.

10           Number one, very bad for customer relations.

11           Number two, if your Honor were to issue such an

12   injunction and the Federal Circuit were to reverse that,

13   then that would be that much more time lost in the

14   marketplace while Mylan would have to resupply the

15   drugstores.

16           But, number three, if that product comes back to

17   Mylan, it has been out of Mylan's hands, and it is millions

18   of dollars worth of product.  If that product comes back to

19   Mylan, we can't just put it on the shelf for future sales.

20   Under good manufacturing procedures, that product is

21   destroyed.  It is gone forever.  That would increase the

22   number that is listed in the declaration we filed last night

23   by roughly 50 percent.

24           THE COURT:  And before you sit down,

25   Mr. Wallace, and we get on with kind of a formal argument

1    part of this procedure, Mylan launched -- I take it

2    knowing -- I mean, there is always some risk associated

3    with a launch without having run the consequences of a

4    launch by opposing counsel and the Court, and yet here we

5    are today with my trying to sort out the aftermath of that.

6              I mean, should I hold Mylan accountable, to some

7    extent, for launching at risk, as I did in what I issued

8    last week?

9              MR. WALLACE:  I think not, your Honor.  And let

10   me explain.  If this were a product that were earlier in its

11   life cycle, as you may recall from the trial testimony,

12   first year sales, it was a stub year, I think we're around

13   9 million.  Then the next year, 40 million.  I've forgotten

14   the exact numbers, but you heard it at trial.

15             This is a product which has now leveled off and

16   appears to be dwindling somewhat.  It's around 130 to 140

17   million.  So one factor Mylan has to consider is if we wait

18   two years, how much of a market will be there.  If we wait

19   75 days, or whatever, will Anchen be doing things to trigger

20   loss of our exclusivity?

21             So those are things that have to be considered

22   in this particular situation.  If there weren't other

23   generics out there, potentially triggering a forfeiture.  If

24   the market were growing at a rapid pace, then it might be an

25   entirely different business decision.  But those are the

1    factors that go into those business decisions.  We have an

2    adjudication that the patent -- patents are invalid and

3    proceeded on that basis.

4            THE COURT:  All right.  So, once again, we have

5    business decisions colliding with a legal world.

6            All right.  Let me go back and I will hear

7    argument, and I take it that the parties will keep my

8    balancing act in the forefront and mention it periodically

9    during their argument.

10           MR. SINGER:  Yes, your Honor.  And Mr. Marsden

11   would like a chance to speak as to some of the bond issues,

12   because I'm flying in from Minneapolis, wasn't quite

13   prepared for those.

14           I actually want to start where you ended with

15   Mr. Wallace, which is the nature of Mylan's decision here

16   and the extent to which this is something that can't be

17   undone because the exclusivity period has begun to run, and

18   we do agree, it has begun to run.  And I think the sense of

19   the argument that I was getting from Mr. Wallace was that

20   they had sort of no choice but to do this at some level.

21   But this really is a self-inflicted wound.

22           And I can talk at length about the generic

23   exclusivity provisions, and I won't bore the Court with all

24   the different permutations that can result here, but the

25   clearest one that the Court should know about is found at

1    21 U.S.C. 355(j)(5)(D).  And what that says is that the

2    Court's decision actually does not start running the clock

3    until the Federal Circuit affirms.

4              And the reason that is in there is there's

5    actually a long history about this, your Honor, and you'll

6    notice that some of the cases cited by Mylan predate 2003

7    and in relation to the generic exclusivity.

8              And what happened in 2003 is that Congress

9    amended the generic exclusivity provisions of the act.  And

10   what had existed before 2003 was that your decision would

11   have actually started running the clock.  That is the way it

12   used to work.  And so generic companies were put to the

13   difficult choice.  If they had approval from the FDA pre-

14   2003, they had to choose whether to launch at risk.  And

15   branded companies on the other side were put in a difficult

16   situation.  A decision from a Court would begin the run of

17   the exclusivity period.

18             And because of that input from the industry, it

19   said, hey, you know, you've set up this incentive for

20   generic exclusivity and it's having all sorts of unintended

21   consequences.  Congress amended it.  And what Congress did

22   in 2003, in the statutory provision that I provided, is said

23   that the actual clock for forfeiture based on your decision

24   does not start to run if there's an appeal until the appeal

25   is resolved.

1          So that's why this was a self-inflicted wound.

2    If Mylan had simply waited for the appeal to be resolved,

3    then there could have been a launch without any consequence,

4    essentially.  Having sort of taken that step and ignored

5    sort of Congress' intent, and I'm not going to say Congress

6    required them to wait because Congress didn't, but certainly

7    the spirit of the act is that because of the drastic

8    consequences that happened when there's a generic launch,

9    Mylan should have waited.

10         With respect to sort of forfeiture from the

11   other defendants, we do intend to appeal the Anchen decision

12   not on the grounds of noninfringement, but if you recall,

13   your Honor, there was an extensive back and forth in the

14   case about whether plaintiffs should have to go forward

15   against Anchen and whether their ANDA was a live ANDA.

16   Remember that?

17              THE COURT:  I do remember.

18              MR. SINGER:  Yes.  And we intend to appeal the

19   Court's decision based on that ground.

20         So there will be an appeal of the entire

21   judgment in this case, and given that, Mylan should have

22   waited.  All they needed to do was respond -- they didn't

23   need to pick up the phone.  They simply needed to respond to

24   phone calls from counsel.  And that's why we don't think the

25   harm to them should be given substantial weight.  And we

1    recognize the balancing act under 62(c) that you have to

2    perform with respect to the harm because, again, this was

3    self-inflicted.

4           One last point on where you ended up with

5    Mr. Wallace.  It's a dwindling market.  This is a market

6    that just got started.  Cephalon didn't begin to sell this

7    product until 2007, and to walk into court and say that a

8    product that was just begun in 2007 from zero and here in

9    2011, I believe the figures are roughly $170 million, from

10   nothing to $170 million in a little over three-and-a-half

11   years is a dwindling market, we just disagree.  That's just

12   not supported by any of the record at trial, and I think the

13   record the a trial would show the precise opposite.

14          So that's, I think, to me, I believe the biggest

15   issue here for you, whose harm matters more.  And at a

16   fundamental level, the harm to Mylan was a self-inflicted

17   one.  And this is something that could have been avoided

18   with, as I said, responding to counsel and conferring, and

19   we could have made motions to actually have this play out in

20   a much more orderly fashion before your Honor.

21          So that's, I think, really the gist of what I

22   wanted to do and respond on the generic exclusivity point.

23   And I'm happy to answer any questions on that.

24          I will just say, this is something the Federal

25   Circuit has done before, so you're not on some kind of

1    unique ground.

2         In the Lily versus Actavis case that I cited,

3    and it's 2010 Westlaw 337 4123, this is what the Federal

4    Circuit did. A patent was found invalid and a motion

5    under Rule 62(c), as was made by our clients, was made to

6    stay a judgment, and the Federal Circuit granted that based

7    on the analysis of the four factor test, which under 62(c)

8    sort of merges. As your Honor knows, from your Honor's own,

9    I think in the Union Carbide decision, your Honor did that

10   as well. So that, we think, is sort of the standard that

11   applies here.

12        And as we note, and I won't belabor this, we are

13   here technically on a motion for reconsideration. And what

14   we have in there is, has there been sort of a clear error by

15   the Court in balancing the harms to both parties in the

16   nature of the likelihood of success test under rule 62(c)

17   for the relief that plaintiffs are seeking, and we don't see

18   that that is there.

19        We have cited precedent to you in both

20   decisions, excuse me, in all our briefing as well as last

21   night, where the exact type of relief that plaintiffs are

22   seeking has been ordered. Even in the face of a loss --

23   and the paper I got from Mylan last night applied very much

24   a circular reason -- that since we have lost, any relief was

25   inappropriate, because they had had a trial and had won, and

1    they did, and though we think, with respect to your Honor,

2    that there are errors in that analysis.

3           But that's not how it works.  Rule 62(c) exists

4    for a reason, and that reason is to balance the nature and

5    the closeness of the decision at the District Court with the

6    harms to the parties.

7           And here we think your Honor found that the

8    likelihood of success, albeit marginally, weighed in our

9    favor because of the issues that were identified, and we

10   think that balancing the harms clearly weighs in the

11   plaintiffs' favor for purposes of entering the stay of the

12   judgment so that an expedited appeal can be pursued.

13          So I think, you know, in a nutshell, I don't

14   need to belabor these points, but I think the major point

15   that I again would ask the Court to take in mind is, in

16   fact, the sort of self-inflicted nature of the harm to Mylan

17   and the dramatic harm to plaintiffs that will result.  And

18   it's not a situation where in two years, we sort of flip the

19   switch and things come back on again.  That's just not the

20   case.

21          As we noted in our papers, just within a week

22   of, or a few days of the Court's decision, employees were

23   given notice, a 30-day notice of having to leave.  The

24   company -- and, again, restarting that process is an

25   enormous undertaking.  To do that again, as it took three

1    years, and now we're being told this is a dwindling market.

2    To go from zero to 140, to go back and essentially do that

3    same thing all over again.  And it's not quite the same

4    thing, because some of what -- that infrastructure does

5    exist, but most of it will be gone.  And there's really

6    no -- there's really nothing to be done about that if the

7    Court does not issue the injunction, or the stay, excuse me,

8    of its judgment for appeal.

9            So that's, in a nutshell, the argument.  I will

10   be happy to answer any questions, particularly on the

11   generic exclusivity point, because I know it's a source of a

12   lot of confusion, but I have laid out, that is the provision

13   that applies here.  Had they simply waited for appeal, we

14   would not be here today.

15           THE COURT:  And I guess what concerns me is not

16   so much -- well, is the maneuver by the other generics while

17   this is being stayed for Mylan, one generic.  I mean, how do

18   I address all the other folks out there who were vying for

19   market position and Mylan has its hands tied, setting aside

20   the self-inflicted --

21           MR. SINGER:  I will set that aside, because a

22   stay of your judgment, the judgment applies to all the

23   generics, and that's the relief that we are seeking as under

24   Rule 62(c), is a stay of that judgment pending appeal stays

25   it for all of them.  And provided we appeal, right,

1    consistent with your order, the generics exclusivity clock

2    will -- it will run because they started it.  But it's not

3    going to stop -- excuse me.  It's not going to allow the

4    other generics onto the market if relief is ordered

5    consistent with a 62(c) stay motion.  There won't be the

6    maneuver as it were.

7              And I will just add that, as Mr. Wallace

8    acknowledges, the other generics don't even have tentative

9    approval yet.  So in some sense, the jockeying that we're

10   talking about, we were told frequently in this case that we

11   were acting precipitously and being premature because the

12   FDA hadn't done this and the FDA hadn't decided that.  Well,

13   the FDA hasn't decided that the other generics even have

14   applications that should be approved yet.

15             So at some level, we're talking about the

16   hypothetical and something that can't be dealt with, but I

17   will say vis-a-vis Anchen, we absolutely intend to appeal

18   that so that the generic exclusivity clock wouldn't have

19   started running but for Mylan's decision to launch.

20             THE COURT:  All right.  Thank you very much.

21             And I don't know, Mr. Marsden, do you want to

22   address the bond issue, and then I will have defendants

23   respond.

24             MR. MARSDEN:  Thank you, your Honor.

25             Just briefly, the bond, I think, actually goes

1     to this question of how can you protect Mylan, and there

2     is a disagreement about the amount of the bond, and we would

3     be happy to address that more fully with your Honor,

4     although we only got their opposition last evening at about

5     11:30, so we have not had a chance to fully consider that.

6            We did propose in our form of order a $1 million

7     bond.  That was not a number we picked out of thin air.

8     That's actually the number that was in the Ivax order that

9     we modeled our form of order after.

10           In fact, the drug in the Ivax case was Pulmicort

11    Respules, and the sales there were more than six times the

12    sales of the drug that's at issue here.  So we think

13    actually the million dollar bond is quite reasonable, but

14    we're also prepared to address the arguments that were made

15    in the opposition that was filed last evening.

16           I will say we need some more information, I

17    think, to respond to that opposition.  You'll see when you

18    review it that it's supported by a declaration from a

19    Mr. Mauro.  And although we received a draft of that on

20    Friday, we were told it was highly confidential, so we

21    couldn't share it with businesspeople inside Cephalon and

22    therefore weren't really able to respond to it.

23           More importantly, the declaration, when you

24    review it, your Honor, you'll see it's quite conclusory, and

25    I'm not going to refer to the numbers because of the

1    agreement Mr. Wallace and I made before coming into by the

2    court.  But you'll see, yes, there are some numbers cited,

3    but how those numbers were calculated is nowhere in the

4    declaration, and in order to respond, we need some basic

5    information, how much have they sold, at what price, what

6    their profit margins are, and then we can have some sense of

7    how they arrived at the number.  Otherwise, it does not make

8    sense.

9            There's also a portion, almost a third of the

10   number they're asking for, that relates to a period after

11   the 180-day exclusivity, and we don't understand the basis

12   for that at all.

13           So the upshot of this, your Honor, is, you can

14   set the appropriate amount of bond after we've been heard on

15   what that amount of bond should be, and we think that

16   addresses whatever considerations should be given to the

17   harm that Mylan may have suffered.

18           I also wanted to briefly address the recall

19   issue that Mr. Wallace also raised.

20           It's our understanding that there is no

21   regulation requiring that recalled product be destroyed.  It

22   is true that good manufacturing practices would require that

23   you be able to understand how the drug was stored, but at

24   least to the extent that this drug that has been shipped is

25   in warehouses, it should be relatively easy for Mylan to

1    reconstruct what the custody has been and how the drug has

2    been stored.

3              With respect to the other factors -- and, your

4    Honor, we don't know what their cost of goods is, but

5    generally the generic's cost of goods is quite low, so even

6    if that product had to be destroyed, we don't believe that

7    damages would be large.

8              With respect to the customer relations and other

9    issues, I think that goes to the point that Mr. Singer

10   raised, which is this is a self-inflicted wound, to a large

11   degree.

12             The only other issue I will raise for now on the

13   form of the order is we had included a ban on manufacturing.

14   I told Mr. Wallace when I came into by the court today that

15   we agree that that can come out of the proposed order, but

16   we otherwise believe that the order should be entered as we

17   provided it to the other side, and we're prepared to hand up

18   that form of order to your Honor this morning.

19             THE COURT:  All right.  Thank you very much.

20             MR. MARSDEN:  Thank you.

21             THE COURT:  Mr. Wallace?

22             MR. WALLACE:  I apologize for my laryngitis.

23   And that's the reason I'm trying to be more of a good

24   listener today than a talker.

25             Several points.  I will be very brief, your

1    Honor.  It is absolutely incorrect that all generic

2    potential competitors are covered by your Honor's judgment,

3    because Impax is out of the case.  They have a deal with

4    Impax.  I've never seen it.  I don't know what it says, but

5    they're not going to be governed by whatever your Honor does

6    with your judgment.  All right?  So that's another potential

7    triggering possibility.

8                    As far as the amount of the bond is concerned, I

9    will take plaintiffs at their word.  Gross sales are now 170

10   million.  I will take Mr. Singer at his word.  Generics will

11   capture 90 percent of the market.  That gives the generics

12   $153 million in sales first year.

13                   I will take Mr. Marsden's word, the generic

14   costs are quite low.  So we're talking about, by their

15   calculations, Mylan in a year should sell $75 million in

16   product with costs quite, quite low.  A million dollar bond

17   is not even in the same universe, your Honor.

18                   The recall -- it's very easy for Mr. Marsden to

19   say, well, we can ask people where they kept product in the

20   warehouse, but as your Honor knows, sometimes evil people

21   tamper with drugs.  You remember the Tylenol scare that

22   almost brought Johnson & Johnson to its demise.

23                   Mylan has good manufacturing practices.  Whether

24   it's required by the law or not, Mylan is not going to

25   gamble on its reputation.  Any product that's recalled,

1    regardless of Mr. Marsden's lecture about the law, will be

2    destroyed, period.  It's not negotiable.

3              I do want to just briefly mention two Federal

4    Circuit cases that I found last night, which may or may not

5    be -- and I think are not in our briefs, and I apologize.

6    We've been filing a lot of briefs, and I apologize, your

7    Honor.

8              One is the Reebok case, 32 F. 3d 1552 from

9    1994.  And the other is the PGH case from the Federal

10   Circuit, 469 F. 3d at 1361 from 2007.

11             And I cite these two cases for a very important

12   proposition, and that relates to the four-part test.  The

13   Federal Circuit in these two cases -- and these are cases

14   for publication.  The Lily case that they keep talking about

15   is a not for publication, non-precedential case.  These are

16   two cases for publication, officially reported.

17             Both cases make it quite clear that if the party

18   requesting injunctive relief cannot show probability of

19   success, that is absolutely the end of the discussion.

20   There's no weighing of the other factors.  No probability of

21   success, end of discussion.

22             And as your Honor knows from our paper we filed

23   on Friday, 50/50 is a matter of law.  We cited cases.  50/50

24   is a matter of law is not probability of success.

25             So thank you very much, your Honor.  I realize

1    these are very complicated issues, and we appreciate your

2    tolerance of all the papers and motions and arguments.

3                    THE COURT:  One final question for you,

4    Mr. Wallace.  In terms of this product that has been

5    destroyed, did you provide me in your papers the costs of

6    that product?

7                    MR. WALLACE:  It has not been destroyed.

8                    THE COURT:  Well, I mean, if --

9                    MR. WALLACE:  If?

10                    THE COURT:  If I were to embrace plaintiffs'

11    position and the terms of the injunction that they are

12    proposing, it seems to me as though one consideration I

13    would want to take into account in weighing that possibility

14    would be the costs of -- the costs of the recall, including

15    the costs of the product.  And if you have not provided me

16    with a number --

17                    MR. WALLACE:  You're absolutely right, I have

18    not provided you with that number because the first versions

19    of the proposed injunction that we got until Friday

20    afternoon didn't even ask for a recall.

21                    THE COURT:  All right.

22                    MR. WALLACE:  I have asked Mylan to attempt to

23    get a declaration addressing that very point today.

24                    THE COURT:  All right.

25                    MR. WALLACE:  That we can get to your Honor.  I

1     can tell you, it would be millions of dollars.  I can't give

2     you a more precise number than that, but I knew you would

3     ask for me that, and that's why yesterday we requested that

4     Mylan move with that posthaste.

5              THE COURT:  All right.  Thank you, Mr. Wallace.

6              MR. WALLACE:  Thank you very much, your Honor.

7              THE COURT:  A final -- oh, yes, sir.  Anyone

8     else?  Yes.  I'm sorry.  All defendants.

9              MR. MIZERK:  Good morning, your Honor.  Don

10    Mizerk on behalf of Anchen.

11             And I wasn't planning on speaking until I heard

12    the plaintiffs say that they thought that whatever order you

13    entered would be a stay of the other defendants as well, and

14    that was news to me.  If you go back to the original

15    pleading, the TRO emergency relief request that the

16    plaintiffs made, that was an injunction, the TRO only

17    against Mylan.  And subsequently we have not even seen all

18    the papers because the Mylan papers were filed under seal,

19    so we don't even know what Mylan has said in response to any

20    of this that has been going on.

21             And I assume, I think that there must just be

22    some wires being crossed on the plaintiffs' side because I

23    would have assumed that if they thought that Anchen at least

24    was going to be used, this TRO motion was directed at Anchen

25    at all, that they would have shared some of these form

1    orders perhaps with Anchen during the course of this

2    proceeding.

3           So I've never seen this order that these people

4    are talking about, the plaintiffs are talking about this

5    morning, and so I think it's the facts of how this has kind

6    of played out is that clearly the plaintiffs, you know,

7    didn't intend any of this to be applied to Anchen or anyone

8    else other than Mylan, because we never even were included

9    in any discussions, any requests, any calls.

10          There were no calls to me ever from plaintiffs'

11   counsel with respect to a TRO or any other kind of

12   injunctive relief.  So that being said, I'm not even

13   prepared to really respond to the substance of any kind of

14   injunction proceeding as it would affect Anchen because I

15   don't believe that that has ever been teed up by the

16   plaintiffs.

17          To the extent, though, that -- you know, I

18   reserve my rights, but to the extent there is going to be

19   any injunction, I think, then, the amount of a bond has got

20   to be substantial.  And, frankly, you know, the numbers that

21   plaintiffs are throwing around, I'm having a hard time

22   seeing what the hardship is.

23          Cephalon was purchased for $6.8 billion by

24   Teva, which is Barr.  Maybe that's why Barr is not here

25   today.  And the notion -- I don't know what the numbers that

1    Mylan is asking for, but certainly, you know, they have

2    probably 150 million in spare change sitting around

3    somewhere they can use to bond some kind of judgment in this

4    case.

5              So that being said, unless your Honor has any

6    questions for Anchen, but it's our position that this does

7    not affect us at all.

8              THE COURT:  All right.  I guess I will have a

9    question at the very end of the proceeding, and that is --

10   and I don't know whether this is an opportune time for you

11   all to get together and make sure you're all at least on the

12   same page with respect to what the outside effect of an

13   injunction might be as requested by plaintiffs, and at least

14   for you all to share some fundamental information, so if

15   anyone wants to file supplemental papers on an expedited

16   basis, you know what you're dealing with.

17             So I might ask you to have an informal

18   discussion before you all leave town.

19             MR. MIZERK:  Your Honor, certainly, just on one

20   point, as far as the Anchen regulatory position at this

21   point, Mr. Singer I think mentioned that they were going to

22   appeal the Anchen case, and I think they said if they had

23   done that, then that would not terminate the stay in the

24   case.  It would be a regulatory -- significant regulatory

25   event.

1            Well, your judgment in our case, irrespective of

2     whether they appeal it or not, from the FDA's perspective,

3     that terminated the 30-month stay.  So the FDA has agreed to

4     give Anchen final approval and any kind of -- there's really

5     nothing else that really is pending or any other effect at

6     this point in time that the judgment has.

7            Had Mylan not launched perhaps, then there would

8     have been an additional regulatory significance to the

9     decision when it either became non-appealable, you know.  So

10    if the plaintiffs didn't appeal that judgment, then it would

11    have an additional regulatory significance of perhaps

12    triggering.  But now that's moot because Mylan actually has

13    launched.  And so the trigger has been pulled and you

14    can't -- there's no resetting, and there's nothing, so it's

15    just a -- if the intent of appealing our judgment is simply

16    to prevent us from being a trigger, well, that's an

17    unnecessary action because the trigger has been pulled and

18    you don't need to pull it twice.  Okay?

19            THE COURT:  All right.

20            MR. MIZERK:  Thank you, your Honor.

21            THE COURT:  Anyone else from defendants'

22    perspective?  I guess Barr's position maybe has changed.  I

23    don't know.

24            MR. SINGER:  Just very briefly, your Honor, with

25    respect to Impax, the parties have settled, but part of that

1    settlement is that if there is no generic on the market,

2    then Impax won't be on the market.  And I believe there's a

3    redacted version that was actually filed with the SEC that

4    defendants are aware of that explains that, and we're happy

5    to provide that to the Court as well.  So they're not going

6    to be somehow swooping in and taking the market.

7              On the actual -- just with respect to Anchen, we

8    didn't make a TRO against them because they don't have

9    tentative approval, so there's nothing to enjoin.  They

10   don't have final approval, but they don't even have

11   tentative approval.  As far as we know, they've provided us

12   no information that they've taken any further steps in the

13   FDA process since that hearing we had -- I think it may have

14   been a year ago right around today -- about their ANDA and

15   failure to pursue it.

16             So, again, that's with respect to Anchen.  And I

17   wasn't saying that your decision had regulatory import.  I

18   was just trying to explain, as Mr. Mizerk acknowledged, that

19   Mylan's decision to launch has sort of accelerated this

20   whole process, and if they had not done that, then our

21   appeal, which has been pending Anchen's decision, would have

22   prevented us from being here today.

23             And then, finally, with respect to the legal

24   standard at issue, I think Mr. Wallace misunderstands sort

25   of the underpinnings of the Court's order.  And as you --

1    I'm sure you remember, your Honor, you've been through this

2    before in the Union Carbide decision.  The Rule 62(c)

3    standard of the stay of judgment, which is the alternative

4    relief we moved for, we moved both to amend the Court's

5    order under 59(e) as well as for a stay under 62(c), and the

6    whole point of 62(c) is to weigh the factors.

7            The Court's order does not say that there's a

8    50/50 chance.  It says that plaintiffs, it says likely as

9    not, and the Court can interpret your own language the way

10   you wish.  I will simply say the Court found that the

11   likelihood of success prong weighed in favor of plaintiffs.

12   And even if it didn't, under Rule 62(c), the Court may take

13   all four factors into place, as the Court did in the Union

14   Carbide case, and weigh the balancing versus the likelihood

15   of success.

16           THE COURT:  One final question.

17           MR. SINGER:  Sure.

18           THE COURT:  I believe Mr. Marsden mentioned a

19   party name, a case in connection with a one million bond

20   being appropriate.  I'm not sure -- and I have not read the

21   papers that came in this morning.  I'm not sure what that

22   was referencing, and it might be helpful to me --

23           MR. SINGER:  I will let him speak.

24           THE COURT:  Thank you very much.

25           MR. MARSDEN:  Your Honor, it is the AstraZeneca

 1    versus Ivax matter, your Honor.  We have all of the papers

 2    from that case because some of them were filed under seal,

 3    but I believe we had we attached to one of our submissions

 4    what we thought were the relevant papers, including the

 5    temporary restraining order on which we modeled our proposed

 6    temporary restraining order.  So you should have those as

 7    exhibits --

 8              THE COURT:  Okay.

 9              MR. MARSDEN:  -- to one of the briefs that we

10    filed last week.

11              THE COURT:  All right.  All right.  As I said to

12    counsel, I don't know whether it would be helpful, since

13    you're all in the same room, to have further discussions

14    just to make sure everyone understands where they are in the

15    process.

16              Is it the case that I should give you another

17    24 hours to get me whatever else you might in connection

18    with this, or is there really no reason to wait and have me

19    go ahead and get this decision out?

20              MR. WALLACE:  Your Honor, I do owe you a

21    declaration on the burdens and costs and consequences of a

22    recall.  I'm hoping to get that to you today, but perhaps in

23    an abundance of caution, if we could keep the record open

24    for 24 hours.

25              THE COURT:  All right.  With the status quo

```
 1        being the status quo until that time?

 2                  MR. WALLACE:  My representation that we will not

 3        ship --

 4                  THE COURT:  All right.

 5                  MR. WALLACE: -- will continue.

 6                  THE COURT:  All right.  I will leave the record

 7        open for 24 hours.

 8                  Mr. Marsden?

 9                  MR. MARSDEN:  Your Honor, I guess our view on

10        that is it would be appropriate for you to enter formally

11        the TRO with the bond that we proposed and with the

12        understanding that we could revisit the amount of that bond

13        once we've received the additional information from

14        defendants and have had an opportunity to respond to it.

15                  MR. WALLACE:  Your Honor, there's certainly no

16        necessity for that.  Mylan is a publicly traded corporation.

17        There are all sorts of repercussions that flow from entry of

18        injunctive relief, and I don't see why we can't let the

19        record stay open for 24 hours, let your Honor consider

20        everything that has been said today, everything that is

21        going to be filed in 24 hours, and proceed in an orderly

22        fashion.  We're not shipping product.

23                  THE COURT:  All right.

24                  MR. MIZERK:  Your Honor --

25                  THE COURT:  Yes?
```

 1              MR. MIZERK:  -- the other Mr. Singer had

 2   mentioned, that they're not asking for a TRO against Anchen

 3   because they don't think they need one, so I think that

 4   clarifies the position, and we don't see that this motion

 5   about a TRO has any impact on Anchen.

 6              THE COURT:  Although the alternate was a stay of

 7   judgment.  I have to go back and assess.  I mean, that's the

 8   problem when you are trying to move things forward, is that

 9   nuances sometimes get past us.

10              So you might want to have a discussion or at

11   least clarify what their position is.

12              MR. MIZERK:  Well, I think there's another

13   motion for a stay of judgment that if we would respond to, I

14   need the papers in order to respond to that so I can see

15   what has been said heretofore, which we have not been able

16   to see.

17              THE COURT:  All right.

18              MR. SINGER:  Your Honor, I believe they've been

19   served with papers.

20              MR. MIZERK:  We got some paper.  Well, is this

21   the Rule 59 motion that we're talking about?

22              MR. SINGER:  Yes.  Rule 59 motion, which I

23   believe is publicly available and was served by ECF on

24   Mr. Mizerk on Thursday.

25              MR. MIZERK:  The Rule 59 motion -- so the

```
 1    briefing, it's not an emergency motion.  It has not even

 2    been -- I don't think anyone has responded to the motion for

 3    a stay.  I thought it was a Rule 59 motion which stays the

 4    appeal, by the way.  I mean, no one can file a notice of

 5    appeal with a Rule 59 motion having been filed.

 6              So the whole thing has just been, you know,

 7    bolloxed up by some crazy motion practice, and that I think

 8    was completely unnecessary.  If that motion is the motion we

 9    need to respond to, then we'll respond to that one.  But,

10    again, I don't know that that motion, my quick reading of it

11    that landed over the weekend --

12              THE COURT:  I guess I do need to work that out

13    and make sure I know what I'm addressing and make sure that

14    if I address the motion for an injunction, that the other

15    motions at that point, I don't think the Federal Circuit

16    will accept an appeal or certainly an expedited appeal if I

17    still have matters pending before me.  So I think we really

18    do have to go forward on some consistent basis.

19              So would you all think about that and write a

20    letter clarifying for me ideally how we get this cleanly up

21    to the Federal Circuit so we can get their words of wisdom

22    as quickly as possible?

23              MR. SINGER:  Yes, your Honor.  We will do that.

24              THE COURT:  All right.  Counsel, thank you for

25    your patience and for educating me about this.
```

1           MR. MARSDEN:  Your Honor, may I speak to one

2     last issue?

3           THE COURT:  Yes.

4           MR. MARSDEN:  I apologize.  But on the timing

5     issue, although it is true that Mylan has represented to us

6     as of Friday afternoon that they are no longer selling or

7     shipping, the product that is out there is being sold in

8     pharmacies, and part of the relief that we had requested is

9     that a letter be sent by Mylan to those to whom they have

10    sold, basically informing them of the Court's order and

11    ensuring that those sales downstream are also stopped.

12          THE COURT:  All right.  Well, I will work as

13    quickly as I can, but I do want to have the information I

14    need to make one decision, that no motions for

15    reconsideration, you just ship it on down to Washington and

16    let them take a look at it.

17          All right.  Thank you very much, counsel.

18          (Counsel respond, "Thank you, your Honor.")

19          (Court recessed at 10:03 a.m.)

20                        -  -  -

21

22

23

24

25